## FOLSOM *vs.* MUSSEY.

In an attempt to charge an agent for negligence in not securing and collecting a debt, the jury may inquire whether he has been guilty of negligence *to the prejudice of the principal.* For to omit to do that, which if done would have been fruitless and unavailing, can in no proper sense be denominated negligence.

THIS was *assumpsit,* on a note of hand, given by the defendant to the plaintiff for $653 43, dated *July* 1, 1828, payable in nine months without interest. The writ also contained a count for money had and received for $300.

The defendant resisted the payment of the note, and relied upon the following circumstances, of which he offered proof.

The defendant was a wharfinger, and had received lumber from time to time of the plaintiff for sale. By the course of their dealings, he sold sometimes for cash, and sometimes on credit, and in either case, gave the plaintiff credit on his book for the amount so sold : it being understood however, that he was not to be his debtor therefor, until the amount was actually received.

On the 10*th of June,* 1828, the defendant sold of the plaintiff's lumber to one *George Houdlette,* who had been solicited

by the plaintiff to make the purchase, to the amount of $478 56, and took his negotiable note therefor, running to the plaintiff or his order, payable in 90 days. The term of credit given was justified by usage. For the proceeds of this sale among others, the plaintiff was credited on the defendant's books.

On the day of the date of the note in suit, the plaintiff wishing to make arrangements to prevent his property being sacrificed, and to preserve it for the benefit of his creditors; and to prevent the defendant from being charged as his trustee, desired the defendant to estimate the value of the lumber on hand and credit him therewith, and in that way to add it to the other items of credit, including the amount of lumber sold to *Houdlette,* then to strike a balance and give him his, the defendant's, note therefor. Which was accordingly done, and the note in suit was given. It being at the same time agreed however, that the defendant should not be any the more liable in consequence of giving said note, but that he should account for what he should actually receive of the items so credited and nothing more. The defendant then having the *Houdlette* note for $478 56, proffered it to the plaintiff, who declined to receive it, preferring that it should remain with the defendant who lived near to *Houdlette;* and the same was indorsed to the defendant in blank.

The lumber, estimated as aforesaid, was sold by the defendant, and produced $28 77 more than the estimate when the note was given.

By a new account between the parties, commencing some time after the note was given, and terminating in *July,* 1829, kept separate and distinct from the other transactions, and in which were various items of debt and credit on the defendant's books, it appeared that there was a balance due to the plaintiff of $17 69.

The plaintiff claimed to recover the above balance under the money count; and also contended that if the defence relied upon was made out, still he was entitled to recover also the excess on the sale of the lumber over the estimate.

The note against *Houdlette* fell due *Sept.* 8, 1828, but it was proved that he had no property that could be attached after that

period, with the exceptions hereafter mentioned, although he continued in extensive business until the winter of 1829—30. It did not appear that the defendant made any effort to collect the note until *Nov.* 18, 1828, except that he went to *Houdlette's* residence in *October* preceding, when he did not see him, but was told by *Houdlette's* son, that his father had no property that could be attached. It was also testified by *Joseph Young*, that he had, as deputy-sheriff, unsatisfied executions against *Houdlette*, to a large amount, from the time said note became due, until he died, and was never able to obtain any thing upon them.

On the 18th of *Nov.* the defendant hearing that *Houdlette* had been sued, caused a writ to be made and attempted to secure the debt, by a trustee process, which however proved of no avail.

On the 27th of *Nov.* he employed an agent to get security for this and several other debts due to himself and to other persons, amounting in the whole to $1000, and gave directions to attach a vessel and a cargo of lumber on board, unless he could get certain personal security, payable in four months, but with discretionary powers to do the best he could. The brig *Emeline* then laid in the river, of which the said *Houdlette* was supposed to be the owner, but of which *James Conner* testified he in fact owned no part, either of the brig or cargo. And *Edward Houdlette*, the son of said *George Houdlette*, testified that the last cargo which he knew of purchased by his father, was the lumber bought of the defendant in *June*, 1828, which was immediately shipped.

The agent employed, took a negotiable note for the whole of the above debts, signed by the said *Houdlette* and one *Converse Lilly*, payable to the defendant in six months. This, the agent testified was the best he could do ; and he then believed it a prudent exercise of the discretion reposed in him. This note the defendant accepted, making no other objection thereto, than to the term of credit, his object being to procure the note to be discounted at some bank, which could not be done for so long a period. *Lilly* was then reputed to be a man of large property, and his note was considered good.

This note arrived at maturity, *May* 27, 1829. It did not ap-

pear that the defendant made any effort to collect it, except that in *September* following, a person at his request called on *Houdlette*, and informed him that the defendant wanted payment, and received some assurance that it should soon be paid.

On the 12*th of October* following, the defendant called on *Houdlette*, and by an arrangement with him, gave up the note which the defendant then held, and took four other notes, each signed by *Houdlette* and *Lilly*, payable on demand, to the persons to whom the lumber sold to *Houdlette* originally belonged.

One of these was taken to the plaintiff for $250 or $260 — one to the defendant himself for about the same amount, and one to *Joseph Southwick*.

The defendant had before advanced to the plaintiff, of the *Houdlette* money, which was indorsed on the note in suit, $127,09, and also a sum sufficient to cover the balances aforesaid of $28,77 and $17,69, which the defendant had wholly lost.

On the 13*th of January* following, it being then known that *Houdlette* and *Lilly* were both deeply insolvent, the defendant caused the three last mentioned notes to be put in suit, and on the writ in favour of the plaintiff there was attached an equity of redemption on certain real estate, mortgaged by *Lilly* to the *Gardiner* Bank, *May* 6, 1829, to secure the payment of $1000. Judgment was recovered at the *August* term of the Court of Common Pleas, 1830, in favour of the plaintiff, for $263,16 debt; — execution issued, and said equity was sold thereon for the whole amount of said execution and all fees; which was paid partly in cash, and partly by a good note, payable to the defendant in one year.

The actions in favour of the defendant and of *Southwick* were prosecuted to judgment; and the executions which issued thereon, were levied on other real estate, supposed to belong to *Houdlette* or *Lilly*, but which ultimately proved not to belong to either.

There was no direct evidence that the plaintiff was advised by the defendant of the proceedings before stated. But there was evidence that he was frequently at *Gardiner*, the residence of the defendant, in the summer and fall of 1828, and afterwards.

*Stephen Webber,* the clerk of the defendant, testified, that the plaintiff frequently spoke to him of *Houdlette's* failure, and of his loss thereby.

The action against *Houdlette* and *Lilly* was prosecuted in the name of the present plaintiff, and there was no evidence that it was not directed by him.

In *May,* 1831, the parties had an interview, a few days prior to the commencement of this suit, when the defendant told the plaintiff that he had realized nothing from the *Houdlette* debt, and that he himself had sustained considerable loss by *Houdlette's* failure. *Cyrus Kendrick* testified, that he was present at that time to assist the defendant, whose sense of hearing was much impaired ; that the defendant then requested the plaintiff to give up his note and come to a settlement, which he, hesitating to do, *Kendrick* narrated to him their original agreement, as he had understood it from the plaintiff, and as it is stated in the first part of this report. That, the plaintiff did not deny the truth of any part of the statement, but in answer to a question, then put to him by *Kendrick,* whether he intended to hold *Mussey* for the payment of the note, replied, that he was not prepared to answer that question then — that his business was that day very urgent at *Augusta,* but that he would come down the next day and settle the business. This he did not do, but caused an action to be instituted on his note.

The defendant then introduced much testimony to prove that, although *Houdlette* and *Lilly* might have the reputation of possessing property, and although the former had the appearance of doing an extensive business, yet that they were really possessed of no visible or attachable property at any period after the notes on which they were at any time liable, were due ; and that the defendant never had it in his power at any time, by process of law, to get payment or security. On this point, evidence to show *Houdlette's* ability was also introduced by the plaintiff.

In relation to the right in equity attached and sold on the execution in the plaintiff's favour, it appeared, that prior to the mortgage to the *Gardiner* Bank, an attachment had been

made of the same premises by one *Sampson*, who obtained judgment at the *Sept.* term of the Supreme Judicial Court in the county of *Lincoln*, and extended his execution on the premises in *October*, 1831. This attachment was unknown to the Bank, to the defendant, and to the purchaser of the equity, and did not come to their knowledge, until the time of the levy of *Sampson's* execution. But the officer at the time of the sale of the equity on the plaintiff's execution, repeatedly declared, that there was no other incumbrance on the premises, than the said mortgage — and in *Nov.* 1831, the purchaser notified the officer, and also the defendant, that they would be required to repay the money given for the equity. No notice of this was given to the plaintiff. The defendant expressed his readiness to do this, and since the commencement of this action did repay it.

The defendant produced testimony to show that the plaintiff had procured a considerable reduction of his debts in *Boston*, by representing that he had sustained a loss by *Houdlette's* failure; and testimony was introduced by the plaintiff to explain the transaction.

In order to show what became of the *Houdlette* debt, originally due to the plaintiff, the defendant produced an assignment of part of the judgment, *Southwick* against *Lilly*, and *Southwick's* certificate that his judgment was too large by about $103; and he proved that at the time of his taking the four notes, *Oct.* 12, 1829, he had not his accounts or minutes with him, and wrote the notes only from recollection of the sums due to each. He also offered an assignment from himself to the plaintiff of the excess of the *Southwick* judgment.

The defendant had never made any charge against the plaintiff, or made any demand upon him for costs or expenses attending this transaction, although he had paid considerable.

It appeared that *Houdlette* died in *May*, 1830, wholly insolvent, and *Lilly*, it was proved, possessed no property.

Much other testimony was introduced by the defendant to prove the trouble and expense he had been at in the business, and to prove that nothing had been omitted by him which would have secured, or tended to secure, any of said debts.

Upon these facts the counsel for the plaintiff contended, that there had been a failure of due diligence on the part of the defendant in the business confided to him, and if so, it was not to be permitted to him to say, that such diligence would have been unavailing. *Weston*, the presiding Judge, instructed the jury that if satisfied of the truth of the facts set up in defence, they ought to find for the defendant; unless it appeared to them that there had been negligence or a want of diligence on his part to the prejudice of the plaintiff; and if so, that they should find such sum in damages against the defendant as would indemnify the plaintiff for the injury he had sustained.

The counsel for the plaintiff further insisted that the defendant had adopted and assumed the *Houdlette* debt by discharging the execution, and receiving in satisfaction thereof a sum of money and a note running to himself, payable in a year. That he had made the debt his own by not giving information to the plaintiff, and denying that the *Houdlette* debt had been secured. And that the subsequent repayment to the purchaser of the equity, under the circumstances of the case, could not impair or defeat the plaintiff's right, flowing out of these transactions.

On the other hand, the counsel for the defendant insisted, that the presumption was violent that the plaintiff was fully informed of the state of his action, and the proceedings under it; and that if he had not directed the suit, the attorney was then present, and could be called to say who employed him. That no demand having been made by the plaintiff on the defendant, of the money received by mistake, he had a right to return it to the party justly reclaiming it; and that no action without such demand, could be maintained for this money, even if it had been rightfully received.

The presiding Judge left all these facts and circumstances to the jury, instructing them that if they believed it was the defendant's intention to assume the *Houdlette* note to himself, they would find for the plaintiff, and that these transactions were evidence of such intention.

The jury returned their verdict for the defendant. If the jury were not properly instructed, the verdict was to be set

aside, and a new trial granted ; otherwise, judgment was to be rendered thereon.

*G. Evans,* for the plaintiff, insisted that the Court should have instructed the jury, that if they were satisfied of the truth of the facts, there had been such gross negligence in this case as precluded the defendant from setting up this defence.

1. No attempt having been made by the defendant to collect the note, when *Houdlette,* at the time it fell due, was doing a large business, and *Lilly* reputed to be a man of wealth, he should be concluded thereby. And the Court should not have left it to the jury to say whether diligence in this respect could have been of any advantage to the plaintiff or not; but the instruction should have been, that the defendant was liable to the plaintiff. in damages if he had been guilty of negligence. For whether due diligence could have collected the note or not, can never be known ; that could only. be determined by the experiment, by the actual attempt to collect, which was not tried in this case.

2. The defendant also made himself liable by his neglecting to inform the plaintiff, from time to time, of the progress of the transaction, and by his fraudulent concealment of an important fact. The defendant declared he had never received any thing of *Houdlette,* when he had in fact received the whole amount of the execution, on a sale of the equity.

3. The defendant made himself liable, and the Court should so have instructed the jury, by his so intermingling the debt of the plaintiff with the property of others, that he can never have it again, being incorporated into *Southwick's* judgment which is not susceptible of division.

4. The Court should not have permitted the jury to judge of the *intention* of the defendant, to appropriate the note to himself and thereby make himself liable to the plaintiff or otherwise. The intention of the defendant had nothing to do with the question. If he had been guilty of *actual negligence,* it was of no importance to the plaintiff what he *intended.*

As to the liability of agents, he cited *Greely v. Bartlett,* 1 . *Greenl.* 178; *Langley v. Sturdivant & al.* 7 *Pick.* 214; *Clark*

*v. Moody & als.* 17 *Mass.* 150; *Paley on Agency,* 42, 44, 60; *Selden & al. v. Beale,* 3 *Greenl.* 178.

5. As to the balance of $17,69 found due to the plaintiff by the defendant's books, this grew out of business and transactions distinct from and entirely *unconnected with the note.* This the plaintiff was entitled to recover at all events, and so the jury should have been instructed.

*Allen,* for the defendant.

The opinion of the Court was delivered by

WESTON J. — The jury have found that the defendant, in relation to the business confided to him, had been guilty of no negligence to the prejudice of the plaintiff, or by which he had suffered loss. To omit to do that, which if done would have been fruitless and unavailing, can in no proper sense be denominated negligence. The jury were upon this point properly instructed; and it was their province to pass upon the facts. Although the defendant had done his duty to the plaintiff, as the jury have found, yet he might have assumed to himself the *Houdlette* debt, and the Judge was requested to rule at the trial, that this was the inference necessarily to be drawn from the facts. The defendant was endeavouring to secure his principals. His proceedings from time to time were directed to that object. The security from *Lilly* was not divided precisely as it ought to have been; but it all turned out to be of no value. We perceive nothing in the facts conclusively proving that the defendant made, or intended to make, the *Houdlette* debt his own. He was not bound to take that hazard upon himself. He was required only to be faithful to his trust; and the jury have settled all the facts in favour of the defendant.

*Judgment on the verdict.*